### GOVERNMENT OF the VIRGIN ISLANDS

v.

**Alrick Lewis ROBERTS.**

Crim. No. 90–166.

United States District Court,
D. Virgin Islands,
St. Croix Division.

Jan. 18, 1991.

Amended Feb. 19, 1991.

James Peters, Asst. U.S. Atty., Christiansted, Virgin Islands, for plaintiff.

Eszart A. Wynter, Christiansted, Virgin Islands, for defendant.

### MEMORANDUM

RAYMOND J. BRODERICK, District Judge, sitting by designation.

The Government seeks an order compelling the defendant, Alrick Roberts, to undergo testing to determine if he is infected with the human immunodeficiency virus (HIV), the causative agent of Acquired Immune Deficiency Syndrome (AIDS). The objective of the requested procedure is to inform the complaining witness, an alleged rape victim, whether the defendant has exposed her to the virus. Because it represents the "intelligent, humane, logical, and proper course of action under the circumstances," *People v. Thomas*, 139 Misc.2d 1072, 1075, 529 N.Y.S.2d 429, 431 (1988), the Government's motion will be granted.

On October 29, 1990, Michael Caswell and a female companion were picnicking at Sandy Point, an isolated beach south of Frederiksted. It is charged that the defendant, armed and dressed in camouflage pants, approached them. He allegedly forced the woman to restrain Caswell with handcuffs that he had brought and then took the pair to a bushy area nearby. Firing a bullet into the ground, Roberts purportedly ordered Caswell to sexually assault the woman. After Caswell said that he could not do so, the defendant, it is claimed, raped the woman at gunpoint and afterward shot her in the neck. When Roberts moved away, the woman fled and swam out to sea. She remained in the water until she was picked up by a passing boat some two hours later. The police found Caswell, nude and handcuffed, with one bullet wound to the head and another to his midsection. According to the police, the female victim subsequently identified Roberts as the Sandy Point assailant. After considering evidence presented at the defendant's pre-trial detention hearing, a magistrate found probable cause to believe that Roberts had committed the crimes of murder in the first degree, aggravated rape, first degree assault, kidnapping for rape, employment of a deadly weapon during the commission of a crime of violence, and robbery. Order of November 9, 1990, at 5.

### I.

A retrovirus called the human T-lymphotropic virus type III/lymphadenopathy-associated virus, and more commonly known as HIV, is the etiologic agent of AIDS. Only three methods are known to transmit the virus: sexual intercourse, transfusion of infected blood products, and perinatal contact. Briefly stated, HIV penetrates and then disables white blood cells that normally check the growth of parasitic infections in the body. HIV-seropositivity, AIDS-related complex (ARC), and AIDS form a spectrum of related conditions. Because HIV is also a lentivirus, there is a time lapse, often of several years, between HIV infection and the onset of symptoms associated with ARC or AIDS, and it is unclear precisely how many HIV-infected persons eventually will develop AIDS. An individual with ARC exhibits some perceptible symptoms of illness, such as persistent fever, weight loss, fatigue, and diarrhea. AIDS itself is a clinical construction or designation reflecting the collapse of the patient's immune system, the consequences of which are an array of opportunistic infections, malignancies, and neurologic manifestations. Today, AIDS is incurable and fatal. *See* National Academy of Sciences, *Confronting AIDS—Update 1988*, at 35–36 (1988); Centers for Disease Control, *Revision of the CDC Surveillance Case Definition for Acquired Immunodeficiency Syndrome*, 36 Morbidity & Mortality Weekly Rep. 1S (Aug. 14, 1987 Supp.); U.S. Public Health Service, *Surgeon General's Report on Acquired Immune Deficiency Syndrome* (1986); Centers for Disease Control, *Classification System for Human T-Lymphotropic Virus Type III/Lymphadenopathy–Associated Virus Infections*, 35 Morbidity & Mortality Weekly Rep. 334, 336–37 (1986); Mueller, *The Epidemiology of the Human Immunodeficiency Virus Infection*, 14 Law, Med. & Health Care 250 (1986); Centers for Disease Control, *Recommendations for Preventing Transmission of Infection with Human T-Lymphotropic Virus Type III/Lymphadenopathy–Associated Virus in the Workplace*, 34 Morbidity and Mortality Weekly Rep. 681 (1985).

The two primary means used to detect HIV infection do not reveal the presence or absence of the virus itself. Rather, they identify serum antibodies produced by the immune system in response to protein components of HIV. *See generally* Centers for Disease Control, *Update: Serologic Testing for Antibody to Human Immunodeficiency Virus*, 36 Morbidity & Mortality Weekly Rep. 833 (1988) (describing technical aspects of testing); Schwartz, Dans & Kinosian, *Human Immunodeficiency Virus Test Evaluation, Performance and Use*, 259 J. A.M.A. 2574 (1988) (same). With the enzyme-linked immunosorbent assay (ELISA), which is employed as a screening device, a blood sample is applied

to cultured HIV protein material and a reagent is administered. Changes in the reagent's color, measured by a spectrophotometer, indicate the level of HIV antibodies. If the ELISA yields a positive result, another ELISA is performed. The Western blot test is commonly used to confirm a double-positive ELISA. In this test, component HIV proteins are transferred onto nitrocellulose paper. The subject blood sample is added. Antibody that bonds with the individual viral proteins "is sandwiched by an antibody probe that is radioactive, or more recently, bound to an enzyme. The resulting complexes are detected by exposing the paper to X-ray film, and 'hotspots' on the film indicate the presence of antibody; alternatively, the enzyme's substrate is added, causing a color reaction in the presence of the complex." Barry, Cleary & Fineberg, *Screening for HIV Infection: Risks, Benefits, and the Burden of Proof,* 14 Law, Med. & Health Care 259, 260 (1986). Although there were initial concerns about their reliability, these tests now have proven to be "extremely accurate," with few false positive when repeated ELISA tests are followed by confirmatory Western blot tests. *Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic* 80 (June 1988); *see also* Centers for Disease Control, *Recommendations for Preventing Transmission of HIV in Health-Care Settings,* 36 Morbidity & Mortality Weekly Rep. 305, 315 (1987); Burke, et al., *Measurement of the False Positive Rate in a Screening Program for Human Immunodeficiency Virus Infections,* 319 New Eng. J. Med. 961, 962 (1988); Edgar, *Mandatory AIDS Testing: Public Health and Private Rights,* 124 F.R.D. 241, 305–06 (1988). "[T]he current sequence of tests used to detect antibodies against HIV, when performed under well controlled conditions in good laboratories, yield both a sensitivity and specificity of greater than 99.8 percent." *Report of the Presidential Commission, supra,* at 2.

## II.

The defendant does not question the Court's authority to compel the extraction of blood for the purpose of HIV testing. Federal Rule of Civil Procedure 41 and the Virgin Islands Code, 5 V.I.C. §§ 3901–02, confer upon the Court power, subject to constitutional limitations, to require the production of nontestimonial evidence, including blood and hair samples. Those provisions, by implication, allow the procedure requested here. *See People v. Durham,* 146 Misc.2d 913, 553 N.Y.S.2d 944 (1990); *Thomas,* 529 N.Y.S.2d at 430–31. Further, the district court possesses authority to shield the administration of criminal justice from "abuses, oppression and injustice," *Bitter v. United States,* 389 U.S. 15, 16, 88 S.Ct. 6, 7, 19 L.Ed.2d 15 (1967), which includes "the inherent power to protect witnesses." *Wheeler v. United States,* 640 F.2d 1116, 1123 (9th Cir.1981). *Accord United States v. Kirk,* 534 F.2d 1262 (8th Cir.1976), *cert.. denied,* 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977). *See generally Eash v. Riggins Trucking Inc.,* 757 F.2d 557, 563–64 (3d Cir.1985). A fair trial for both the defendant and the Government is facilitated by diminishing potential threats—which in this case directly arise out of events that form the basis of the criminal charges against Roberts—to the complaining witness's well-being. As will be explained later, the results of the proposed HIV antibody test can assist in safeguarding the physical health of the alleged victim and can help dissipate the ongoing mental anxieties she has both for herself and for those whom she might expose to the virus.

Nor does Roberts request an evidentiary hearing or contend that one is necessary. He agrees in essence with the pertinent facts set forth in the Government's motion, and, in any event, because they are well-documented in the medical literature, the Court takes judicial notice of them. The defendant does not complain that the requested blood test is uniquely offensive to him for religious or other reasons. As such, a full adversary presentation would be of no utility. *Cf. Winston v. Lee,* 470 U.S. 753, 763 n. 6, 105 S.Ct. 1611, 1618 n. 6, 84 L.Ed.2d 662 (1985).

Rather, the defendant's sole argument is that the compulsory extraction and analysis of his blood would, as a general proposition, offend the fourth amendment to the Constitution. The fourth amendment, applicable to the Virgin Islands through section 3 of the Revised Organic Act of 1954, secures the right of the citizenry against unreasonable searches and seizures. This "most valued" guarantee shields an individual's bodily integrity and legitimate expectations of privacy against certain forms of official intrusion. *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). *Accord Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Schmerber v. California,* 384 U.S. 757, 767, 86 S.Ct. 1826, 1834, 16 L.Ed.2d 908 (1966). The fourth amendment does not, of course, forbid "all intrusions as such," but only those "which are not justified in the circumstances, or which are made in an improper manner." *Schmerber,* 384 U.S. at 768, 86 S.Ct. at 1834. *Accord United States v. Montoya de Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985); *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985).

Once probable cause arises and once certain procedural requisites are satisfied, "it is ordinarily justifiable for the community to demand that the individual give up some part of his interest in privacy and security to advance the community's vital interests in law enforcement; such a search is generally 'reasonable' in the Amendment's terms." *Lee,* 470 U.S. at 759, 105 S.Ct. at 1616. That showing does not end the inquiry, however, if the challenged intrusion is more substantial than that associated with a traditional search, such as when a governmental entity seeks to probe surgically under the accused's skin. *Id.* at 760–61, 105 S.Ct. at 1612–13; *United States v. Chaidez,* 919 F.2d 1193, 1197 (7th Cir.1990). In that case, to ascertain whether the proposed search violates the reasonableness component of the fourth amendment, the court must balance "the extent of the intrusion against the need for it." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985). *Accord National Treasure Employers Union v. Von Raab,* 489 U.S. 656, 679, 109 S.Ct. 1384, 1397, 103 L.Ed.2d 685 (1989); *Lee,* 470 U.S. at 760, 105 S.Ct. at 1616; *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *Delaware v. Prouse,* 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979).

The Court notes initially that there is probable cause to conclude that Roberts exposed the complaining witness to his sexual fluids—a known method of HIV transmission. That determination is necessarily entailed in the magistrate's finding that probable cause exists to believe that the defendant raped her. The magistrate's decision in this respect is plainly supported by the evidence introduced at the pre-trial detention hearing, and Roberts does not challenge the ruling.

Unquestionably, a nonconsensual intrusion into the body for blood, which requires a percutaneous invasion and thereby implicates one's interests in bodily security, is a search within the meaning of the fourth amendment. *Skinner v. Railway Labor Executives Ass'n,* 489 U.S. 602, 616, 109 S.Ct. 1402, 1412, 103 L.Ed.2d 639 (1989). Courts long have recognized, however, that blood testing is commonplace and routine in today's society, *Breithaupt v. Abram,* 352 U.S. 432, 436, 77 S.Ct. 408, 410, 1 L.Ed.2d 448 (1957), and that "for most people the procedure involves virtually no risk, trauma, or pain." *Schmerber,* 384 U.S. at 771, 86 S.Ct. at 1836. *Accord South Dakota v. Neville,* 459 U.S. 553, 563, 103 S.Ct. 916, 922, 74 L.Ed.2d 748 (1983). As such, the intrusion required to extract blood is "not significant," *Railway Labor Executives Ass'n,* 489 U.S. at 625, 109 S.Ct. at 1417, or "unduly extensive." *Lee,* 470 U.S. at 762, 105 S.Ct. at 1617.

Although the intrusion occasioned by the procedure itself is minor, compelled HIV testing gives rise to a graver concern. The subsequent chemical analysis of the blood sample "can reveal a host of private medical facts" about the individual being tested. *Railway Labor Executives Ass'n,* 489 U.S. at 617, 109 S.Ct. at 1413. This includes not

only whether that person is diabetic or a drug user, for example, *id.* at 647, 109 S.Ct. at 1429 (Marshall, J., dissenting), but also, as is the purpose of the inspection proposed here, whether he or she has been infected with HIV. *See Doe v. Roe,* 139 Misc.2d 209, 213, 526 N.Y.S.2d 718, 721 (1988).

Disclosure of the latter information obviously can have devastating consequences. *See Cain v. Hyatt,* 734 F.Supp. 671, 679–80 (E.D.Pa.1990). Since first identified in the early 1980s as a distinct medical condition, AIDS has engendered such prejudice and apprehension that its diagnosis typically signifies a social death as concrete as the physical one which follows. Despite authoritative medical evidence to the contrary, a large portion of the American population believes "AIDS is as contagious, or more contagious, than the common cold," Note, *The Constitutional Rights of AIDS Carriers,* 99 Harv.L.Rev. 1274, 1274 n. 6 (1986), and "[f]ew aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness." *School Bd. of Nassau County v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987). The pervasive anxiety that HIV is easily transmitted converges with and often ostensibly justifies the disapprobation of its victims. Societies long have entertained bizarre conceptions about the etiology of illness and interpreted the contraction of disease, including cancer, as punishment for moral turpitude. *Id.* at 284 & nn. 12–13, 107 S.Ct. at 1129 & nn. 12–13; S. Sontag, *Illness as Metaphor* 6 (1978); Hoffman, *Employment Discrimination Based on Cancer History: The Need for Federal Legislation,* 59 Temple L.Q. 1, 2–9 (1986). The particular associations AIDS shares with sexuality, narcotics use, and members of historically disenfranchised groups accentuates the tendency to visit condemnation upon its victims. S. Sontag, *AIDS and Its Metaphors* 44–46, 54–59 (1989). *Accord* Dunlap, *AIDS and Discrimination in the United States: Reflections on the Nature of Prejudice in a Virus,* 34 Vill.L.Rev. 909, 917–20 (1989).

AIDS mythology has fomented not only private judgments about carriers of the virus. It has spawned calls for punitive, oppressive official action against them "in every public forum and institution in this society, in virtually every context imaginable." *Id.* at 913. Vast segments of the American populace favor the forced quarantine of persons with AIDS, Sullivan & Field, *AIDS and the Coercive Power of the State,* 23 Harv.C.R.C.L.L.Rev. 139, 143–46 (1988); Parmet, *AIDS and Quarantine: The Revival of an Archaic Doctrine,* 14 Hofstra L.Rev. 53 (1985), tattooing HIV-positive persons for ready identification, Blendon & Donelan, *Discrimination Against People with AIDS: The Public's Perspective,* 319 New Eng.J.Med. 1022, 1023–26 (1988), and banishing HIV carriers from the workplace and school. *Id.* Thus, to conclude that persons with AIDS or HIV are stigmatized is an understatement; they are widely stereotyped as indelibly miasmic, untouchable, physically and morally polluted.

The degree to which this unwarranted, but nonetheless substantial, injury might accrue to an accused who is mandated to undergo HIV testing, however, is a function of how widely the results are disseminated. The risk of stigmatic harm therefore speaks not to whether the search should transpire in the first instance, but rather to the extent to which the private medical facts learned from the procedure should be disclosed. Here, only the defendant, the alleged victim, and their doctors will discover the outcome of the test. The information will be used solely for the purpose of receiving medical or psychiatric treatment. *See Whalen v. Roe,* 429 U.S. 589, 602, 97 S.Ct. 869, 877, 51 L.Ed.2d 64 (1977); *Planned Parenthood of Cent. Missouri v. Danforth,* 428 U.S. 52, 79–81, 96 S.Ct. 2831, 2845–46, 49 L.Ed.2d 788 (1976). The laboratory conducting the analysis will do so without knowledge of who supplied the blood. Roberts' HIV status will not be aired at trial or any other proceeding. Indeed, the Government will not receive the test results at all. Under these circumstances, the procedure does not comprise a significant infringement on the defendant's privacy. *See Railway Labor Executives Ass'n,* 489 U.S. at 626 n. 7, 109 S.Ct. at

1418 n. 7; *Johnetta J. v. Municipal Court*, 218 Cal.App.3d 1255, 267 Cal.Rptr. 666, 680 (1990); *see also United States v. Westinghouse Elec. Corp.*, 638 F.2d 570, 580 (3d Cir.1980); *Plowman v. United States Dep't of Army*, 698 F.Supp. 627, 635 (E.D. Va.1988); *Local 1812, Am. Fed. of Gov't Employees v. Department of State*, 662 F.Supp. 50, 53 (D.D.C.1987).

Against Roberts' circumscribed interests in avoiding the requested search, there is a compelling need to conduct it. First, the Government has an interest in protecting victims of sexual assault. This stems not only from its general and legitimate concern that members of the public who may have had contact with carriers of a communicable virus procure appropriate medical care. It also arises from the Government's indisputably vital interest in the just enforcement of its criminal laws. The outcome of an accused rapist's HIV test, because it supplies a vital ingredient in formulating an efficacious program of monitoring and treatment for the victim, directly affects the physical and mental well-being of a witness who continues to be imperiled by the consequences of the alleged offense.

As the defendant concedes, there is an unpredictable latency period between initial infection with the virus itself and the development of HIV antibodies that can be detected by testing. Seroconversion, the process by which the immune system generates antibodies and the time at which HIV infection may be identified, typically occurs three to six months after exposure. Some individuals, however, do not develop antibodies for fourteen months or more. Mueller, *supra*, 14 Law, Med. & Health Care at 253–54; *see also Thomas*, 529 N.Y.S.2d at 431. A person who is infected will nevertheless test negative for HIV during this time between infection and seropositivity. For up to a year after the attack and perhaps longer, then, a rape victim cannot conclude from her own negative HIV test results that her assailant did not expose her to the virus or that she is not infected and therefore capable of transmitting HIV to others.

For this reason, there is "considerable medical utility" in examining the blood of the putative source of HIV infection, even though the results are not dispositive. *Johnetta J.*, 267 Cal.Rptr. at 671. First, providing all relevant information to victims and their doctors about possible exposure aids them in fashioning a proper medical regimen. *See* Centers for Disease Control, *Guidelines for Prevention of Transmission of Human Immunodeficiency Virus and Hepatitis B Virus to Health–Care and Public Safety Workers, reprinted in* 5 Reports on HIV/AIDS January–December 1989, at 131 (1990); OSHA Instruction CPL 2–2.44B, Feb. 27, 1990, at B–14. As explained by the Chief of Staff at San Francisco General Hospital, a negative HIV test of a possible source of infection serves many purposes:

It informs the patient that the risk of infection is decreased even further. It assists the physician's ability to assess the risk of infection, which will affect the degree of monitoring and other precautions the physician will prescribe for his patient. It also assists the physician in diagnosing and understanding the cause of medical problems that may arise. Information of a negative test result significantly reduces the anxiety of the ... victim. Allaying the fears of a patient can be an important factor in a treatment program. Anxiety itself can cause or complicate medical problems and can impede recovery. Where a fatal disease is involved, having access to all information bearing on the question of possible exposure can be of great assistance in relieving a patient's anxiety.

*Johnetta J.*, 267 Cal.Rptr. at 671. Conversely, a positive test of the person who may have infected another "inform[s] the physician that additional and more extensive monitoring of the patient's medical condition is warranted than would be the case were the results of the test negative." *Id.*, 267 Cal.Rptr. at 672 (quoting William Drew, M.D.). The status of the potential source is also an "important factor" in deciding whether a patient should subject herself to experimental prophylactic courses of treatment, such as the pre-seropositive intake of azidothymidine (AZT).

*Id.; see* Booth, *NIH Offers AZT to Exposed Workers,* 243 Science 1137 (1989); Friedland, *Early Treatment for HIV: The Time Has Come,* 322 N.Eng.J.Med. 1000 (1990); Henderson & Gerberding, *Prophylactic Zidovudine After Occupational Exposure to the Human Immunodeficiency Virus: An Interim Analysis,* 160 J. Infectious Diseases 321 (1989); LaFon, Lehrman & Barry, *Prophylactically Administered Retrovir in Health Care Workers Potentially Exposed to the Human Immunodeficiency Virus,* 158 J. Infectious Diseases 503 (1988); Sacks & Rose, *Zidovudine Prophylaxis for Needlestick Exposure to Human Immunodeficiency Virus: A Decision Analysis,* 5 J.Gen.Internal Med. 132 (Mar.–Apr.1990); Prentice, The Times (London), Jan. 11, 1991 (Home News) (available on NEXIS); Woodman, A.P. Newsfile, Jan. 10, 1991 (Home News) (available on NEXIS); N.Y. Times, Nov. 11, 1990, at A1; Nesmith, U.P.I. Proprietary, Dec. 9, 1989 (General News) (available on NEXIS); L.A. Times, Mar. 6, 1989, pt. 2, at 3; L.A. Times, Feb. 24, 1989, pt. 1, at 1; *see also* Edgar, *supra,* 124 F.R.D. at 308; N.Y. Times, Feb. 15, 1991, at A1 (describing recent developments); Financial Times, Jan. 8, 1991, § 1, at 14 (same); Wash. Post, Jan. 2, 1991, § 1, at A3 (same).

Second, the Government has a substantial interest in curbing the transmission of HIV. That end is furthered by the provision of crucial medical data to an individual whom the defendant may have exposed to an infectious disease by criminal means. The outcome of a potential source's test affects the degree to which a person should undertake precautionary measures to ensure the virus is not spread to others. It is pertinent to the decision whether to engage in intimate relations. Because an HIV carrier cannot procreate "without endangering the lives of both the offspring and the other parent," *Doe v. Dolton Elem. School Dist.,* 694 F.Supp. 440, 444 (N.D.Ill. 1988), knowledge of the defendant's HIV status assists the victim in weighing the risks of bearing children. *See* Tuckson, *supra,* 124 F.R.D. at 292. As one commentator has noted, it is "unconscionable" to force persons who involuntarily have been exposed to the fluids of another to "live

with weeks and even months of anxiety, terror and disruption of their own sexual lives" by withholding the information that HIV antibody testing of a putative source can reveal. Edgar, *supra,* 124 F.R.D. at 307.

In sum, because the important governmental interests served by the nonconsensual extraction of the defendant's blood for HIV testing and the subsequent disclosure of its contents to very few people plainly eclipse those of the defendant in preventing the search, the contemplated procedure is reasonable under the fourth amendment. *Johnetta J.,* 267 Cal.Rptr. at 674–83; *Durham,* 553 N.Y.S.2d at 946–47; *Thomas,* 529 N.Y.S.2d at 431; *People v. Toure,* 137 Misc.2d 1066, 523 N.Y.S.2d 746, 748 (1988). The motion therefore will be granted.