UNITED STATES of America,

v.

David James WARD, Appellant.

Nos. 96–5789, 97–5082.

United States Court of Appeals,
Third Circuit.

Argued Oct. 15, 1997.

Decided Nov. 13, 1997.

Donald J. McCauley (argued), Office of the Federal Public Defender, Newark, NJ, for Appellant.

Kevin McNulty, Allan Tananbaum (argued), Office of the United States Attorney, Newark, NJ, for Appellee.

Before: STAPLETON, ALITO, and ROSENN, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

■ The primary issue in this case is whether a United States district court may order a criminal defendant convicted of an offense involving sexual assaults on his victim to undergo blood testing to determine the presence of the virus that causes Acquired Immune Deficiency Syndrome ("AIDS"). The court ordered the defendant to undergo the testing based on its "inherent authority" to shield the criminal justice system from "abuses, oppression and injustice," and to "protect witnesses." The court limited disclosure of the test results to the defendant, the victim of the sexual assault, and their respective doctors. We do not subscribe to the district court's reliance on "inherent authority" when there is statutory authorization. We hold that a district court may order such testing under the recently amended federal Violence Against Women Act (the "Act"). Because the district court did not apply the Act, it did not make certain required findings under the Act before ordering the test. Hence, the case will be remanded to the district court with directions to make the requisite findings.

### I.

The following undisputed facts are taken from the defendant's guilty plea colloquy in the United States District Court for the District of New Jersey and the Presentence Investigation Report. On December 4, 1995, the defendant, David J. Ward, who was employed as a commercial truck driver, abducted a 24–year–old woman he met while she was working as a waitress and bartender at the bar of a Marriott Courtyard Hotel in New Jersey which Ward had been patronizing. Ward arrived at the bar at approximately 4 p.m. and stayed until approximately 9:30 p.m., at which time he left. Several hours later, after the bar closed, the victim also left and walked to her car in a nearby parking lot. Ward jumped on her back, hurled her to the ground, and after unsuccessfully attempting to tape her mouth, wrapped duct tape around her face and head, bound her hands and feet with plastic flexible cuffs, and carried her through a wooded area to his truck parked nearby. That night, in the sleeper compartment of his truck, Ward sexually assaulted the victim by, among other things, digital penetration of her vagina and unsuccessful penile penetration, followed by penile and digital penetration of her rectal area. Over the next three days, Ward kept the victim captive in his truck by binding and gagging her and by threatening to harm her. During this time, he delivered and picked up cargo in different states, including New York and Indiana. Also during this period, Ward brutally sexually assaulted the victim numerous other times, including performing oral and anal sex on her, forcing her to perform oral sex on him, ejaculating on her back, and inserting his fingers into her vagina.

On December 7, Ward and the victim arrived at a truck stop in Indianapolis. Ward left his truck, telling the victim he would return in eight to 10 minutes. After Ward left the truck, the victim removed the plastic cuffs which bound her hands and ankles by

using a nail clipper she found in the truck. She left the truck and after at first failing to enlist the assistance of a man at the truck stop, obtained the aid of another man who notified a security guard. The guard arrived on the scene promptly and called the police. By this time, Ward had fled in his truck. The victim described Ward to the police. Illinois State Police Officers arrested Ward a short time later on an interstate highway near Springfield, Illinois.

On January 30, 1996, a federal grand jury sitting in Newark, New Jersey, indicted Ward on one count of kidnaping in violation of 18 U.S.C. § 1201. On May 1, 1996, the Government moved the district court for an order requiring Ward to provide a blood sample so that he could be tested for the presence of human immunodeficiency virus ("HIV"), the virus that causes AIDS. On July 10, 1996, Ward pleaded guilty to the indictment. Later, after extensive briefing and oral argument, the court granted the Government's motion and ordered Ward to provide the blood sample. The court directed that the results remain confidential except for disclosure to the victim, Ward, and their respective doctors.

Pursuant to the United States Sentencing Guidelines, after adjustments, the court assigned Ward a total offense level of 40. This included a three-point reduction based on Ward's acceptance of responsibility for his crime. Also included in the offense level was a two-level upward departure, pursuant to U.S.S.G. § 2A3.1, application note 7, which provides: "[i]f the defendant's criminal history includes a prior sentence for conduct that is similar to the instant offense, an upward departure may be warranted." In 1983, Ward had been convicted in a Minnesota state court of sexually assaulting a jogger at knife point. Based on Ward's numerous prior convictions, the district court placed him in criminal history category IV. His 1983 conviction for the sexual assault was used in calculating this criminal history score. The sentencing guideline range for an offense level of 40 and a criminal history category IV

is 360 months to life imprisonment. The court sentenced Ward to 720 months imprisonment.

Ward timely appealed and raises two issues.[1] He argues that the district court erred when it ordered him to undergo the blood test for the presence of HIV and when it departed upwardly based on his having committed a similar sexual assault in 1983 in Minnesota.

## II.

■ Because it is a legal question, this court exercises plenary review of the propriety of the district court's order requiring Ward to submit to a blood test for the presence of HIV. *See Karnes v. Skrutski,* 62 F.3d 485, 490 (3d Cir.1995).

## A.

In the district court, the Government argued that the court had the power to order the testing for the presence of HIV pursuant to the Violence Against Women Act, *see* Pub.L. No. 103–322, § 40503(a), (b), 108 Stat. 1796, 1945–50 (codified in part at 42 U.S.C. §§ 10607(c), 14011 (1995)), the All Writs Act, 28 U.S.C. § 1651(a), or the courts' inherent authority. The court rejected the Violence Against Women Act as a basis for permitting the test, finding it "void" because of a codification defect and did not rule on the government's All Writs Act argument. Instead, citing *Government of Virgin Islands v. Roberts,* 756 F.Supp. 898 (D.Vi.1991), the district court relied on its inherent authority. Acting on its inherent power to protect the criminal justice system from "abuses, oppression and injustice" and to "protect witnesses," the *Roberts* court ordered a defendant charged with raping and shooting a woman to undergo blood testing for the presence of HIV. *Roberts,* 756 F.Supp. at 900 (citations omitted).

Ward challenges the district court's order in this case on two grounds: he argues that

---

1. The district court had subject-matter jurisdiction of this case because Ward was charged with kidnaping, which is an offense against the laws of the United States. *See* 18 U.S.C. § 3231.

This Court has appellate jurisdiction because Ward appeals from the final judgment of the district court. *See* 28 U.S.C. § 1291.

the court did not have inherent authority to enter the order and that the order violated his right to be free from unreasonable searches.

■ In refusing to apply the Violence Against Women Act as a basis for permitting the test, the court reasoned that the Act was void because the codified version did not specify which individuals are subject to testing for the presence of HIV. The version of the Act contained in the Statutes at Large, however, clearly identifies the individuals subject to testing. On September 13, 1994, Congress amended the Violence Against Women Act. *See* Pub.L. No. 103–322, 108 Stat. 1796, 1945–50 (1994) *(reprinted in* 1994 U.S.C.C.A.N. (108 Stat.) 1796, 1945–50). In § 40503(b)(1) of the amendments, Congress gave the district courts the authority to order a criminal defendant charged with "an offense of the type referred to in subsection (a)" of the amendments to be tested for the presence of HIV under certain circumstances, with the test results to be disclosed to the victim and, with court permission, a limited number of other persons. *See* Pub.L. No. 103–322, § 40503(b)(1), 1994 U.S.C.C.A.N. (108 Stat.) 1946.[2]

Subsection (a) of § 40503 amended another part of the Act, 42 U.S.C. § 10607(c), and provides in part:

> The Attorney General shall provide for the payment of the cost of up to 2 anonymous and confidential tests of the victim for sexually transmitted diseases, including HIV, gonorrhea, herpes, chlamydia, and syphilis, during the 12 months following

> sexual assaults that pose a risk of transmission ... of sexually transmitted diseases to the victim as the result of the assault.

Pub.L. No. 103–322, § 40503(a), 1994 U.S.C.C.A.N. (108 Stat.) 1946 (italics added). Section 40503(b) of the amendments is codified at 42 U.S.C. § 14011(b). However, no text appears at 42 U.S.C. § 14011(a). Only the word "omitted" appears there. The omission appears to have resulted from the inclusion of the § 40503(a) amendment in a section of the Act codified at a different part of the United States Code, namely 42 U.S.C. § 10607(c). Although "subsection (a)" of the Statutes–at–Large version fully appears at § 40503(a), there is nothing at "subsection (a)" of 42 U.S.C. § 14011.

■ Thus, there is a clear conflict between the codification and Statutes–at–Large version of the Act. It is evident that even though the codified version of the amendments contains no "subsection (a)," the italicized part of the Statutes–at–Large version identifies the "offense" referred to in subsection 14011(b)(1). The codified version of legislation is *prima facie* evidence of the laws of the United States unless Congress has enacted the particular title into positive law. 1 U.S.C. § 204(a) (1995). "[T]he very meaning of 'prima facie' is that the Code cannot prevail over the Statutes at Large when the two are inconsistent." *Stephan v. United States*, 319 U.S. 423, 426, 63 S.Ct. 1135, 1137, 87 L.Ed. 1490 (1943). Congress has not enacted Title 42 into positive law. When there is such a conflict, the version in the Statutes at

---

2. 42 U.S.C. §§ 14011(b)(1)–(2) (108 Stat. 1946, §§ 40503(b)(1)–(2)) provide:

(b) Limited testing of defendants

(1) Court order—The victim of an offense of the type referred to in subsection (a) of this section may obtain an order in the district court of the United States for the district in which charges are brought against the defendant charged with the offense, after notice to the defendant and an opportunity to be heard, requiring that the defendant be tested for the presence of the etiologic agent for acquired immune deficiency syndrome, and that the results of the test be communicated to the victim and the defendant. Any test result given to the victim or the defendant must be accompanied by appropriate counseling.

(2) Showing required—To obtain an order under paragraph (1), the victim must demonstrate that—(A) the defendant has been charged with the offense in a State or Federal court, and if the defendant has been arrested without a warrant, a probable cause determination has been made; (B) the test for the etiologic agent for acquired immune deficiency syndrome is requested by the victim after appropriate counseling; and (C) the test would provide information necessary for health of the victim of the alleged offense and the court determines that the alleged conduct of the defendant created a risk of transmission, as determined by the Centers for Disease Control, of the etiologic agent for acquired immune deficiency syndrome to the victim.

Large, *i.e.,* the one which appears at 108 Stat. 1796, 1946–50, must control. *See, e.g., American Bank & Trust Co. v. Dallas County,* 463 U.S. 855, 864 n. 8, 103 S.Ct. 3369, 3376, 77 L.Ed.2d 1072 (1983) ("the Statutes at Large prevail over the Code whenever the two are inconsistent") (citations omitted); *United States v. Welden,* 377 U.S. 95, 98–99 n. 4, 84 S.Ct. 1082, 1085 n. 4, 12 L.Ed.2d 152 (1963) (" 'the Code cannot prevail over the Statutes at Large when the two are inconsistent' ") (quoting *Stephan,* 319 U.S. at 426, 63 S.Ct. at 1136); *see also United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.,* 508 U.S. 439, 448, 113 S.Ct. 2173, 2179, 124 L.Ed.2d 402 (1993).[3] The error in the codified version of the Act was not the fault of Congress, but of the codifiers. Thus, the Act gave the district court authority to order the accused to undergo a blood test if the showing prescribed in 42 U.S.C. § 14011(b) was made.

### B.

■■■■ Ward next contends that the district court's order violated his Fourth Amendment right to be free from unreasonable searches.[4] Generally, for a search to be reasonable, a government agent must establish probable cause to believe that evidence will be found on the person to be searched and obtain permission to conduct the search from a neutral and detached magistrate. "An essential purpose of a warrant requirement is to protect privacy interests by assuring citizens subject to a search ... that such intrusions are not the random or arbitrary acts of government agents." *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 621–22, 109 S.Ct. 1402, 1415–16, 103 L.Ed.2d 639 (1989). However, what is reasonable depends on all of the circumstances surrounding the search and the nature of the search itself. *United States v. Montoya de*

*Hernandez,* 473 U.S. 531, 537, 105 S.Ct. 3304, 3308, 87 L.Ed.2d 381 (1985) (citing *New Jersey v. T.L.O.,* 469 U.S. 325, 337–42, 105 S.Ct. 733, 740–43, 83 L.Ed.2d 720 (1985)). The Fourth Amendment does not prohibit all government intrusions; it prohibits only those which are unjustified or made in an improper manner. *Schmerber v. California,* 384 U.S. 757, 768, 86 S.Ct. 1826, 1834–35, 16 L.Ed.2d 908 (1966). There is no doubt that a compelled blood test like the one in this case is a body intrusion and a "search" within the meaning of the Fourth Amendment. *See Skinner,* 489 U.S. at 616, 109 S.Ct. at 1412–13; *Schmerber,* 384 U.S. at 767, 86 S.Ct. at 1833–34. It must be reasonable in order to satisfy the Fourth Amendment and performed in a manner appropriate under the circumstances. Therefore, the critical question in this case is whether the court acted reasonably in ordering Ward to submit to the blood test and whether the procedures to be employed in taking the blood are reasonable and meet the Fourth Amendment standards. *See* 384 U.S. at 768, 86 S.Ct. at 1834–35.

It is difficult to see how a search of this type conducted in accordance with the procedures outlined in the Act could be "unreasonable" within the meaning of the Fourth Amendment. Indeed, the Act's procedures provide the subject of a search with *more* protection than that required by the Fourth Amendment, adequately assuring that the search is "not the random or arbitrary act[ ] of government agents." 489 U.S. at 622, 109 S.Ct. at 1416. In sum, it satisfies Ward's concern for "unwarranted disclosure of medical records and information about one's medical condition." First, under the Act, a blood test is permissible only in certain limited circumstances: when the subject of the search is charged with a sexual assault that poses a risk of transmitting HIV, there has been a probable cause determination that the

---

3. *Accord Time Warner Cable v. Doyle,* 66 F.3d 867, 878 n. 11 (7th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 974, 133 L.Ed.2d 894 (1996); *Time Warner Entertainment Co., LP v. FCC,* 56 F.3d 151, 193 n. 12 (D.C.Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 911, 133 L.Ed.2d 842 (1996); *Preston v. Heckler,* 734 F.2d 1359, 1368 (9th Cir.1984).

4. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

subject of the search committed the assault, the victim requested the test, and the test would provide information necessary for the victim's health. 42 U.S.C. § 14011(b)(2). Second, the test is only permitted if the subject of the test receives notice that the victim has requested the test and is given an opportunity to contest the entry of the court's order. 42 U.S.C. § 14011(b)(1).[5] Finally, the test results must be kept confidential. They may be disclosed only to the victim, and, with the court's permission, to the defendant and the victim's medical professional or counselor, family member, or post-assault sexual partners, 42 U.S.C. § 14011(b)(5), and may not be used in any criminal trial against the defendant. 42 U.S.C. § 14011(b)(6). The court is required to seal the test results and the related court proceedings and may exercise its contempt power to punish those who violate the Act's confidentiality requirements. *Id.;* 42 U.S.C. § 14011(b)(7).

Consistent with the Fourth Amendment, the Act assures that government officials conduct tests only of individuals for which they have sufficient justification. *See Schmerber,* 384 U.S. at 767–68, 86 S.Ct. at 1833–35. The Act requires that there be probable cause to believe that the subject of the search has sexually assaulted the victim in a manner which creates a risk of transmission of HIV. Further, the Act requires that the blood test be administered only for a proper purpose, *see id.* at 768, 86 S.Ct. at 1834–35, and the test is allowed only if it will provide information necessary for the health of the victim. Also, like the Fourth Amendment, the Act's requirement that testing not be permitted without the consent of a neutral and detached judicial officer similarly prevents arbitrary intrusions by government agents. Finally, the Act permits only a relatively unintrusive blood test for limited information, with extremely narrow disclosure. "Such tests are a common-place in these days of periodic physical examinations and experience with them teaches that the quantity of blood extracted is minimal, and that for most people the procedure involves virtually no

risk, trauma, or pain." 384 U.S. at 771, 86 S.Ct. at 1836.

 The Act provides greater protection than the Fourth Amendment does. The Fourth Amendment does not entitle the subject of a search to contest the sufficiency of probable cause before the search is executed; generally, the government need only obtain the approval of a neutral judicial officer *ex parte* to execute a search warrant lawfully. Also unlike the Act, in many circumstances, the Fourth Amendment does not mandate that the government keep the results of the search confidential or prohibit the government from using the evidence against the subject of the search in a criminal trial. In light of the extensive protections afforded by the Act, there can be no doubt that a blood test under its authority for the limited purpose of ascertaining the presence of HIV complies with the Fourth Amendment.

 Ward's claim that the test does not satisfy the "special needs" test articulated in *Skinner* and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989), is without merit. The Government argues, and we agree, that there is no need here for a hearing to demonstrate its "special need" for testing Ward's blood, a test not of his blood generally, but only to detect the presence, if any, of HIV. Actually, *Skinner* and *Von Raab* offer a further basis on which the testing is permissible. Early HIV testing of an admitted rapist, or even an accused rapist, provides necessary information for the prompt and vital treatment and mental well-being of the victim. The Government also has an equally important interest in curbing the transmission of HIV which "is furthered by the provision of crucial medical data to an individual whom the defendant may have exposed to an infectious disease by criminal means. The outcome of [the test] affects the degree to which a person should undertake precautionary measures to ensure the virus is not spread to others." *Roberts,* 756

---

5. Ward had numerous opportunities to argue against the search. He submitted at least two briefs in opposition to the Government's motion for the test and the district court held hearings on two days to allow Ward to offer additional arguments against the Government's motion.

F.Supp. at .903; *see also Dunn v. White,* 880 F.2d 1188, 1195 (10th Cir.1989).

▮▮▮▮ No warrant or individualized suspicion is required when the Government is able to prove the existence of a "special need" beyond the normal need for law enforcement which makes the warrant and probable cause requirements impracticable. *See Chandler v. Miller,* — U.S. —, —, 117 S.Ct. 1295, 1301, 137 L.Ed.2d 513 (1997); *Skinner,* 489 U.S. at 619, 109 S.Ct. at 1414.[6] Once the Government establishes the existence of a special need, a court must then balance the public interests in requiring the search against the interference with liberty that result from the test. *Von Raab,* 489 U.S. at 671, 109 S.Ct. at 1393–94. "In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." *Skinner,* 489 U.S. at 624, 109 S.Ct. at 1417.

There is no doubt the Government has a special need for requiring the test beyond the ordinary need for law enforcement in this case. The special needs in this case are insuring that the victims of sexual assaults are notified promptly, whether or not their attackers carry HIV, and preventing a sexual assault victim from unwittingly transmitting the virus to others. Depending on the results of the test, notification either gives victims the peace of mind that they are not infected with HIV or allows them to arrange for counseling and take early and aggressive medical treatment. The results also permit victims to modify their lifestyles accordingly so as to avoid transmitting the disease. Testing the attacker is closely connected to the special need. At this point in medical history, a test of the attacker is the only quick and relatively reliable way to notify the victim whether he or she is likely to have contracted HIV. A test of the victim is unlikely to yield this information because the

virus may not be detected for up to several years after the sexual assault. We, therefore, have no difficulty in concluding that the Government has established a special need for prompt testing of the assailant.

▮▮▮▮ The next step is to weigh the public's interest against the legitimate expectation of privacy of the person to be searched. *Von Raab,* 489 U.S. at 671, 109 S.Ct. at 1393–94. The intrusion on Ward's privacy is minimal, especially in light of the danger in which he placed the victim's health by his admitted repeated sexual assaults on her. Even apart from Ward's status as a prisoner in a federal penal institution with severely reduced rights of privacy, his right to resist a blood test highly critical in evaluating the health of the victim of his sexual assaults, is extremely minimal. We also note that because Ward's right to privacy is not abridged by the blood test in the Fourth Amendment context, the test does not violate his right to privacy contained in other parts of the Constitution. *See generally Doe v. SEPTA,* 72 F.3d 1133, 1138–39 (3d Cir.1995), *cert. denied,* — U.S. —, 117 S.Ct. 51, 136 L.Ed.2d 15 (1996).

### III.

▮▮▮▮ Ward next contends that the district court erred when it increased his offense level by two levels because his "criminal history includes a prior sentence for conduct that is similar to the instant offense." U.S.S.G. § 2A3.1, application note 7. The Government contends that Ward explicitly waived this argument at the sentencing hearing. We agree. At the sentencing hearing, when the court questioned Ward's counsel about his objection to the upward departure under application note 7, Ward's counsel replied: "The defendant does have a prior conviction, and the commentary clearly says that that may be a basis for an upward departure." Ward now claims that he was only admitting that he *literally* met the requirements for an upward departure and maintains that he argued at sentencing that the upward departure was improper. In support

---

**6.** This case is distinguishable from the ordinary special needs test because the Act requires that the government have an "individualized suspicion" that the subject of the search sexually

assaulted the victim and requires the approval of a neutral and detached judicial officer before testing is allowed.

of his argument, he points to statements by his counsel claims that "[it]'s taken into account," and "they are taken into account in the law," as meaning that the prior attack was taken into account by his heightened criminal history score and should not be used to increase his criminal history category.

That argument is disingenuous. These references in the record to which Ward points relate to his opposition to another upward departure made by the district court. This other departure was based on the multiple sexual assaults on the victim. Following his concession to the upward departure for the 1983 attack, Ward's counsel claimed the upward departure for multiple attacks on the victim was "totally wrong" and "[not] based in law." He went on to make further arguments in that regard and respond to the district court's questions regarding that upward departure. During these exchanges, Ward's counsel and the district court never even mentioned the departure for the 1983 attack. Hence, we deny Ward's appeal on this ground.

 We note that even if Ward properly preserved this argument in the district court, we would deny his appeal on this ground. The commentary to the guideline applicable at Ward's sentencing explicitly provides for the upward departure made by the district court: "[i]f the defendant's criminal history includes a prior sentence for conduct that is similar to the instant offense, an upward departure may be warranted." U.S.S.G. § 2A3.1, application note 7. His prior commission of a similar offense involving sexual abuse, therefore, qualified as an "encouraged factor" for departure pursuant to *Koon v. United States*, — U.S. —, —, 116 S.Ct. 2035, 2045, 135 L.Ed.2d 392 (1996). Although the extent of the departure is quite high, it was an exercise of judicial discretion which was not abusive under the circumstances. Contrary to Ward's suggestion, the district court's application of U.S.S.G. § 2A3.1 does not violate 18 U.S.C. § 3553(b) by basing an upward departure on conduct already adequately taken into consideration in the calculation of appellant's sentencing guideline. Although the 1983 conviction was used in calculating Ward's criminal history category, that conviction was not adequately taken into consideration in calculating Ward's sentencing guideline because, in the context of this case, there is a qualitative difference between a "conviction for any offense resulting in a term of imprisonment greater than one year" and a conviction for a prior sexual assault. Because the 1983 conviction was for a similar prior sexual assault, it could be considered again, consistent with 18 U.S.C. § 3553, in justifying an upward departure.

## IV.

Accordingly, we affirm the judgment of the district court except as to its order with respect to Ward's blood testing which will be vacated pending the district court's making the findings required by the Violence Against Women Act, 42 U.S.C. § 14011(b). The case will be remanded for the district court's application of the Act and to make the Act's factual findings. Because of the lapse of time since the attack on the victim, and the critical importance to her well-being of timely test results, the Clerk of the Court is directed to issue the mandate immediately with directions to the district court to take such action as is consistent with this opinion within 20 days from the date of the mandate.