STATE OF NEBRASKA, APPELLEE, V. STEVEN R. BUNNER, APPELLANT.

453 N.W.2d 97

Filed March 30, 1990.   Nos. 89-163, 89-164.

Douglas Veith, of Veith, P.C., Bertolini, Schroeder and Blount, for appellant.

Robert M. Spire, Attorney General, and LeRoy W. Sievers for appellee.

Hastings, C.J., White, Caporale, Shanahan, Grant, and Fahrnbruch, JJ., and Ronin, D.J., Retired.

Shanahan, J.

Steven R. Bunner appeals from sentences imposed after his convictions on two counts of first degree sexual assault, in violation of Neb. Rev. Stat. § 28-319 (Reissue 1989), which provides: "(1) Any person who subjects another person to sexual penetration and (a) overcomes the victim by force, threat of force, express or implied, coercion, or deception . . . is guilty of sexual assault in the first degree." First degree sexual assault is a Class II felony, see § 28-319(2), punishable by a maximum penalty of 50 years' imprisonment, see Neb. Rev. Stat. § 28-105(1) (Reissue 1985). Bunner contends that a denial of due process in sentencing resulted in excessive sentences imposed on Bunner and requests that his sentences be set aside. The factual background pertaining to this appeal was presented at the hearing when Bunner entered his guilty pleas to the sexual

assault charges and at the sentence hearing for Bunner.

The first sexual assault involving Bunner occurred shortly after midnight on September 7, 1987. Bunner climbed through a partially opened window in the victim's apartment and entered her bedroom. He was wearing a hooded sweatshirt with the hood pulled over his head and was also wearing a ski mask, which covered his face except for his eyes and mouth. The victim, an adult female alone in the apartment, was sleeping in the bedroom and suddenly awakened to find Bunner at bedside, peering down at her. Bunner told the victim, "Don't scream; don't you say anything." At that point, Bunner forced the victim to remove her nightwear, remain on the bed, and submit to sexual penetration by Bunner, who sought to cover the victim's face with a pillow, since she had been screaming and crying throughout the assault. When the victim resisted the pillow maneuver, Bunner started to stuff a cloth into the victim's mouth, but then ordered the victim to lie face down on the bed. At the conclusion of the assault, Bunner prowled around the apartment and eventually crawled out through a bedroom window. The victim immediately reported the sexual assault to police, who took the victim to a nearby hospital, where a physician examined her and observed bruises and bleeding in the victim's vaginal area but no other medically noteworthy physical injuries to the victim.

The second sexual assault occurred in the early hours of July 18, 1988. Bunner saw the victim, an adult woman, enter her apartment. Shortly thereafter, Bunner approached the apartment, cut the screen on one of the apartment's windows, entered, and found the victim alone and asleep in the bedroom. The victim was suddenly awakened by Bunner's sexual penetration of her and saw that a stocking cap covered Bunner's face. After the assault, Bunner asked the frightened victim whether she wanted to see his face, to which the victim answered "no." Bunner told the victim that he would telephone her later in the day. During a physical examination at a hospital shortly after the sexual assault, the victim displayed a nervous and distraught state but no medically significant physical injuries. Bunner telephoned the victim, and, through further investigation, police were able to locate Bunner, who was later

taken into custody.

The State charged Bunner with two counts of first degree sexual assault and two counts of burglary. Pursuant to a plea agreement, Bunner entered guilty pleas to the charges of first degree sexual assault, and the burglary charges were dismissed by the State. Before accepting the guilty pleas, the district court inquired into Bunner's ability to understand the proceedings and informed Bunner concerning his constitutional rights, the effect of Bunner's waiver of rights, and the consequences of a guilty plea to the charges, including the possible penalties for conviction on the charges. After the State presented a factual basis for each of the charges against Bunner, the court inquired of Bunner's lawyer: "I assume, Mr. Veith, that you have had full access to the files of the County Attorney in this case?" Bunner's lawyer responded: "Yes, Your Honor." After Bunner stated that he understood the information imparted by the judge and waived the rights accorded a defendant, the court accepted Bunner's plea of guilty to each count of first degree sexual assault.

At the sentence hearing for Bunner, the presentence investigation report on Bunner was examined. In the course of discussion concerning the presentence report, the court asked Bunner's lawyer: "And, Mr. Veith, have you had a reasonable opportunity in point of view of time to review the content of the presentence report?" Bunner's lawyer answered: "Yes, Your Honor, I have." The court immediately inquired: "Are there any matters appearing therein which require correction or discussion?" The response from Bunner's lawyer was: "Not that I can think of, Your Honor, no." The presentence report consisted of approximately 200 pages, which included detailed police reports concerning each sexual assault to which Bunner had pled guilty, medical reports, communications from each victim, and several letters from individuals who expressed their views about the sentence to be imposed on Bunner. After allocution, which indicated no legal justification for withholding sentence on Bunner, the court sentenced Bunner to a term of not less than 10 nor more than 15 years in the Nebraska Penal and Correctional Complex on each count, which sentences are to be served consecutively.

Bunner contends that the district court committed reversible error by not conducting an evidentiary hearing, independent of or as a distinct part of a sentence hearing, to determine whether the victims sustained serious personal injuries as the result of sexual assault by Bunner. As a basis for his contention, Bunner refers to § 28-319(2), which, concerning first degree sexual assault as a Class II felony, states: "The sentencing judge shall consider whether the actor shall have caused serious personal injury to the victim in reaching his decision on the sentence." "Serious personal injury" is defined as "great bodily injury or disfigurement, extreme mental anguish or mental trauma, pregnancy, disease, or loss or impairment of a sexual or reproductive organ." Neb. Rev. Stat. § 28-318(4) (Reissue 1989).

Bunner asserts that the district court erred "in sentencing [Bunner] without a specific finding of extreme mental trauma or anguish or, finding such, did so on insufficient grounds in violation of the statutory requirements in Section 28-319(2)," brief for appellant at 5, and relies on *State v. Country*, 194 Neb. 570, 234 N.W.2d 593 (1975), wherein this court construed Neb. Rev. Stat. § 28-408.03 (Reissue 1975), the statutory predecessor for § 28-319(2) of the Nebraska Criminal Code enacted in 1977, and expressed:

> It seems to us that the provisions relating to the determination of punishment [i.e., whether the actor shall have caused serious personal injury to the victim] make it necessary that before a judge can, on a plea of guilty or nolo contendere, determine a sentence he must in some manner determine the fact and extent of the serious personal injury inflicted on the victim by the actor. *Probably, this determination can be made only by means of an evidentiary hearing unless serious personal injury is admitted.*

(Emphasis supplied.) 194 Neb. at 573, 234 N.W.2d at 595.

Bunner further asserts:

> Appellant was not allowed the opportunity to dispute any claims of serious personal injury, nor was Appellant afforded the opportunity to offer evidence to the contrary. . . . When the Appellant's or any other individual's liberty

is at stake, then Appellant or any other individual should be afforded his or her due process rights as guaranteed by the Nebraska and United States Constitutions. This is especially true, in cases such as this, when the individual has not had the opportunity to dispute the prosecution's claims, offer evidence on his or her own behalf, nor admitted serious personal injury.

Brief for appellant at 9-10.

Consequently, Bunner's assignments of error and appellate argument may be synthesized and distilled as follows: Before a court can sentence a defendant who is convicted of first degree sexual assault, the sentencing court must conduct an evidentiary hearing required by § 28-319(2) and determine whether the victim has sustained serious bodily injury from the sexual assault. From the foregoing, Bunner concludes that in the absence of the prerequisite hearing pursuant to § 28-319(2), a sentence for a sexual assault conviction contravenes due process guaranteed to a defendant in the sentencing process.

Bunner's argument is premised on a twofold fallacy and, therefore, is doubly defective.

NECESSITY OF AN EVIDENTIARY HEARING

Recently, in *State v. Martin*, 232 Neb. 385, 440 N.W.2d 676 (1989), we considered an argument similar to Bunner's.

In *Martin*, the defendant was convicted of, among other offenses, three counts of first degree sexual assault and, on appeal, also relied on *State v. Country, supra*, claiming that there must be a separate hearing to determine serious personal injury before imposition of sentence on a conviction for sexual assault. However, the *Martin* court noted:

The defendant in the *Country* case entered a plea, and there was no trial or evidentiary hearing. The record was blank regarding the details of the crime. In this case, however, the court had received detailed descriptions from the victims of the assaults and descriptions by medical and law enforcement professionals, as well as by other witnesses, as to the emotional impact on the victims. Specific victim impact statements were also contained in the presentence report. Additionally, the court had

observed the witnesses in their testimony, and any observations of emotional trauma could validly be used in determining the extent of serious personal injury to the victims. Therefore, an additional hearing to determine serious personal injury was not necessary.

This record is replete with observations by others of the mental trauma experienced by the victims immediately after the assaults. The presentence report contains letters from the victims as well as letters from members of the victims' families detailing the mental anguish and trauma suffered by the victims. The testimony of each victim was that she feared for her life and offered no resistance because of her fear.

232 Neb. at 397, 440 N.W.2d at 685.

Bunner hastens to point out that *Martin* involved a trial which led to a conviction for assault, but Bunner's convictions resulted from guilty pleas. Hence, according to Bunner, in the absence of a trial, an evidentiary hearing is required so that a sentencing court will be supplied with information necessary to determine whether a sexual assault victim has sustained serious bodily injury. However, on reading § 28-319(2), we find no requirement that before sentence is imposed on a defendant convicted of first degree sexual assault, there must be an evidentiary hearing to determine whether a sexual assault victim has sustained serious personal injury. Section 28-319(2) simply requires a sentencing judge to "consider" whether a defendant who has been convicted of first degree sexual assault inflicted serious personal injury on the sexual assault victim. For that reason, we hold that, in accordance with § 28-319(2), a sentencing judge, before imposition of a sentence on a defendant convicted of first degree sexual assault, is not required to conduct an evidentiary hearing to determine whether the victim has sustained serious personal injury as a result of the sexual assault by the defendant; rather, concerning the question of personal injury to the victim, the judge shall consider information appropriately before the court in the sentencing process. Consequently, insofar as the expression in *State v. Country*, 194 Neb. 570, 573, 234 N.W.2d 593, 595 (1975), namely, "Probably, this determination can be made

only by means of an evidentiary hearing unless serious personal injury is admitted," may be interpreted to require an evidentiary hearing relative to § 28-319(2), *Country* is disapproved. Thus, Bunner's argument is partially based on the fallacious premise that § 28-319(2) requires an evidentiary hearing before imposition of sentence on a defendant convicted of first degree sexual assault.

## DUE PROCESS AT SENTENCING

Bunner next contends that, since there was no evidentiary hearing in his case to ascertain whether the victims sustained serious personal injury, the sentencing court had no information for consideration in determining the sentences to be imposed for convictions of first degree sexual assault, notwithstanding the directive in § 28-319(2) that "[t]he sentencing judge shall consider whether the actor shall have caused serious personal injury to the victim" of the sexual assault for which the defendant has been convicted. As Bunner sees the situation, there were insufficient grounds to be considered in reference to serious personal injury sustained by Bunner's victims.

Bunner's perspective of the consequences to a victim of sexual assault apparently results from a lack of understanding of, disdain for, or indifference to the nature of first degree sexual assault, formerly and commonly known as rape by force or forcible rape. As one writer has expressed regarding rape by force and what has come to be known as the rape trauma syndrome:

> In the first phase, the victim experiences disorganization in lifestyle. Emotional reactions range from fear, humiliation, and embarrassment to anger and a desire for revenge. Although fear of physical violence and death dominates the victim's feelings, self-blame is also very prominent. During this phase, when the victim feels the impact of the rape most severely, she may exhibit one of two widely divergent emotional styles. In the expressed style, feelings of fear, anger, and anxiety are manifested through crying, sobbing, smiling, restlessness, and tenseness. In the controlled style, feelings are masked by a

calm, composed, or subdued demeanor.

The second phase involves a long-term process of physical and emotional reorganization. This phase often begins about two to three weeks after the attack. Symptoms may include change in residence, travel to sources of support in other cities, nightmares, and various phobic reactions. [These reactions include fear of indoors and outdoors (depending on where the rape occurred), fear of being alone, fear of crowds, and sexual fears.] Although all victims do not experience the same symptoms in the same sequence, victims consistently experience the disorganization phase. Many victims thereafter experience mild to moderate symptoms in the reorganization process. Few victims report no symptoms.

Note, *Expert Testimony on Rape Trauma Syndrome: An Argument for Limited Admissibility*, 63 Wash. L. Rev. 1063, 1064 (1988).

Another author notes:

Those who were attacked while alone reported fear of being alone and those who were attacked while sleeping in bed reported fear of being indoors. Others developed fear of crowds, fear of people walking behind them, or fear of the outdoors, depending on the circumstances of their assaults. . . .

. . . .

. . . [T]he victim experiences feelings of shock, fear, humiliation, vulnerability, powerlessness, anxiety, and disgust. . . . [W]hen she attempts to reorganize her life . . . she may continue to experience fear, nightmares about the assault, depression, avoidance responses to people and situations that take the form of phobias, changes in lifestyle, anxiety, and sexual and interpersonal dysfunctions.

Massaro, *Experts, Psychology, Credibility, and Rape: The Rape Trauma Syndrome Issue and Its Implications for Expert Psychological Testimony*, 69 Minn. L. Rev. 395, 426-28 (1985).

Addressing various phases in consequences of a sexual assault with force, another commentator relates that a victim experiences the

fear of physical injury, mutilation, and death, caused by the threat of being killed, which is inherent in most rape assaults. Other typical symptoms . . . include feelings of humiliation, degradation, guilt, shame, embarrassment, anger, and revenge, as well as mood swings and irritability caused by intrusive recollections of the incident. [Another phase] is characterized by a change in lifestyle, dreams, nightmares and other sleep disturbances, depression, and the development of fears and phobias related to the specific circumstances of the attack.

Comment, *Expert Testimony on Rape Trauma Syndrome: Admissibility and Effective Use in Criminal Rape Prosecution,* 33 Am. U.L. Rev. 417, 427 (1984).

Still another author has observed: "In essence, all victims of rape react to the assault as a stressful, violent, and life-threatening experience. . . . [A] rape victim's psychological sequelae mirror those of victims of other violent crimes." Note, *Checking the Allure of Increased Conviction Rates: The Admissibility of Expert Testimony on Rape Trauma Syndrome in Criminal Proceedings,* 70 Va. L. Rev. 1657, 1670 (1984).

Consequently, it is all too evident that one need not be specially trained in medicine or psychology to recognize and appreciate the injury from a forceful sexual intrusion into another's body and invasion of the mind and very personality of another human being. The nature of a sexual assault through force, a crime which Bunner has admitted by his guilty pleas, furnished a basis for a judicial determination that a sexual assault victim sustained "serious personal injury" in the form of "extreme mental anguish or mental trauma." See § 28-318(4).

Regarding the type of information properly available to a sentencing court, at the outset we note that the Nebraska Evidence Rules, Neb. Rev. Stat. §§ 27-101 to 27-1103 (Reissue 1989), are inapplicable to a sentence hearing. See, Neb. Evid. R. 1101(4), § 27-1101(4) (Nebraska Evidence Rules do not apply to "[p]roceedings for . . . sentencing"); *State v. Dillon,* 222 Neb. 131, 382 N.W.2d 353 (1986).

In *State v. Jackson,* 225 Neb. 843, 859, 408 N.W.2d 720, 731 (1987), we expressed: "In a sentence hearing, a court, generally,

has broad discretion concerning the source of information and the type of information to be considered." This court, in *State v. Porter*, 209 Neb. 722, 723-24, 310 N.W.2d 926, 927 (1981), observed: "We have gone so far as to say that the latitude allowed a sentencing judge in such instances is almost without limitation as long as it is relevant to the issue."

A sentencing judge may consider relevant information contained in a presentence report on the defendant to determine an appropriate sentence within the statutorily authorized penalty, punishment, or disposition applicable to the crime for which the defendant has been convicted. See, *State v. Goodpasture*, 215 Neb. 341, 338 N.W.2d 446 (1983); *State v. Porter, supra*; *State v. Rose*, 183 Neb. 809, 164 N.W.2d 646 (1969).

Concerning basic fairness necessary for due process in sentencing, we have stated: "[A] convicted defendant, even in a noncapital case, has a due process right to inquire into an incorrect assumption by the sentencing judge, untrue information materially affecting a prospective sentence, or other misinformation which a court may use in determining what sentence will be imposed." *State v. Barker*, 231 Neb. 430, 435, 436 N.W.2d 520, 523 (1989).

The relevant factual information in the presentence report on Bunner and the very nature of the crime committed supplied the sentencing judge with a sufficient basis for the conclusion that Bunner's victims had sustained serious personal injury, that is, extreme mental anguish or mental trauma, as the result of sexual assault by Bunner. See § 28-318(4). Bunner did not dispute any of the information supplied to the sentencing court and has failed to indicate any incorrect or untrue information which affected the sentences imposed on Bunner.

Regarding allocution as a part of Nebraska's criminal procedure, Neb. Rev. Stat. § 29-2201 (Reissue 1989) provides: "Before the sentence is pronounced, the defendant must be informed by the court of the verdict of the jury, and asked whether he has anything to say why judgment should not be passed against him." At the time of allocution, Bunner offered no reason why sentence should not have been imposed upon him. In *State v. Barker, supra*, we said: "As one commentator

has observed: 'Today the most practical rationale underlying allocution is that it provides an opportunity for the offender and defense counsel to contest any disputed factual basis for the sentence . . . .' A. Campbell, Law of Sentencing § 72 at 232 (1978)." 231 Neb. at 436, 436 N.W.2d at 524.

Thus, the balance of Bunner's argument about his sentence is based on the fallacy that the sentencing court lacked sufficient information concerning personal injury to Bunner's sexual assault victims.

"A sentence imposed within the statutory limits will not be disturbed on appeal unless the sentencing court has abused its discretion in the sentence imposed." *State v. Kitt*, 232 Neb. 237, 240, 440 N.W.2d 234, 236 (1989). See, also, *State v. Dillon*, 222 Neb. 131, 382 N.W.2d 353 (1986).

Bunner's assignments of error are without merit. Bunner's convictions and sentences are affirmed.

AFFIRMED.