2012 VT 21

## State of Vermont v. Jay S. Handy, Sr.

[44 A.3d 776]

No. 10-399

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed March 23, 2012

---

*William H. Sorrell*, Attorney General, and *Ultan Doyle* and *David Tartter*, Assistant Attorneys General, Montpelier, for Plaintiff-Appellee.

*Joshua S. O'Hara* of *Maguire Law Associates, PLC*, Essex Junction, for Defendant-Appellant.

¶ 1. **Johnson, J.** Following defendant's conviction for a sex offense, the superior court, criminal division, granted the State's motion to compel defendant to submit to testing for sexually transmitted diseases under the authority of 13 V.S.A. § 3256, which does not require probable cause or a warrant for testing. On appeal, defendant argues that the statute is unconstitutional because it does not serve any special need beyond law enforcement justifying abandonment of the normal probable-cause and warrant requirements and because, even if such a special need were present, the governmental goals advanced by the statute do not outweigh his constitutionally protected privacy interests. We affirm the trial court's order compelling the testing, but we remand the matter for the court to issue an order restricting the victim's disclosure of the test results.

¶ 2. In November 2009, defendant was convicted of lewd or lascivious conduct, in violation of 13 V.S.A. § 2601, as the result of his having had nonconsensual sexual intercourse with the victim in a public place on October 28, 2007. In March 2010, at the behest of the victim as authorized by § 3256, the State moved for the trial court to order defendant to submit to testing for sexually transmitted diseases based on his conviction for a crime involving a sexual act that created a risk of exposing the victim to the etiologic agent for acquired immune deficiency syndrome (AIDS).

¶ 3. Upon completion of a brief nonevidentiary hearing, the trial court issued an order concluding that it was compelled to grant the State's motion under § 3256, even though it had been nearly three years since the assault occurred, and that the statute was constitutional. The court stated that "[t]he obvious purpose of the statute is to enable the victim of a criminal sexual act to determine if he or she has been, or will be, further victimized by contracting AIDS or other sexually transmitted diseases." According to the court, "[s]uch information would enable a victim to address his or her physical and medical condition in a meaningful way." Regarding defendant's privacy rights, the court noted that any test results could not be used against defendant in criminal proceedings and that, if the test results were positive, the victim had the right to discuss her physical and medical condition with medical providers, friends, family, and potential intimate partners.

¶ 4. Accordingly, the court ordered that defendant submit to testing for AIDS and other sexually transmitted diseases, that the test results be disclosed only to defendant and the victim, and that the test results and the record of the court proceedings be sealed. The court also noted that either the victim or the State on behalf of the victim could seek a civil contempt order if defendant refused to comply with the court-ordered testing.

¶ 5. On appeal, defendant argues that the trial court erred by concluding that the purposes underlying § 3256 represented special needs sufficient to abandon the warrant and probable-cause requirements under Article Eleven of the Vermont Constitution, and further that, even if the statute represented such special needs, those special needs did not overcome his constitutionally protected privacy rights.

■ ■ ¶ 6. Article Eleven is implicated in this case because the taking of a blood sample or cheek swab is unquestionably a search that triggers constitutional protections. See *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 616 (1989) (recognizing that taking blood sample for alcohol or drug screening is search under Fourth Amendment); *State v. Martin*, 2008 VT 53, ¶ 14, 184 Vt. 23, 955 A.2d 1144 (holding "that DNA sampling, by blood draw or by cheek swab, is subject to constitutional protections"); *In re J.G.*, 701 A.2d 1260, 1265 (N.J. 1997) ("That the testing of blood for HIV is a search within the meaning of the Fourth Amendment and Article I, Paragraph 7 is uncontroverted."). Article Eleven,

like the Fourth Amendment, "does not contemplate an absolute prohibition on warrantless searches or seizures, but circumstances under which warrantless searches or seizures are permitted must be jealously and carefully drawn." *State v. Welch*, 160 Vt. 70, 78-79, 624 A.2d 1105, 1110 (1992).

¶ 7. Toward that end, this Court has adopted as part of its Article Eleven jurisprudence, in the context of administrative searches, the "special needs" standard of review set forth by Justice Blackman in his dissent in *O'Connor v. Ortega*, 480 U.S. 709 (1987). See *State v. Berard*, 154 Vt. 306, 310-11, 576 A.2d 118, 120-21 (1990) (adopting "special needs" standard to review random warrantless searches of inmates' cells); see also *Martin*, 2008 VT 53, ¶¶ 15-35 (applying "special needs" standard in context of challenge to constitutionality of statute compelling nonviolent felons to submit DNA samples for inclusion in state and federal DNA databases). Similarly, other jurisdictions have applied a special-needs analysis in reviewing constitutional challenges to statutes compelling sex offenders to submit to testing, at the request of the victim, for sexually transmitted diseases. See, e.g., *United States v. Ward*, 131 F.3d 335, 341-42 (3d Cir. 1997) (applying special-needs test in rejecting constitutional challenge to federal statute allowing victims to obtain HIV testing of sexual assault perpetrators); *State v. Superior Court*, 930 P.2d 488, 493-94 (Ariz. Ct. App. 1996) (applying special-needs test in upholding constitutionality of state statute allowing sexual crime victims to obtain HIV testing of perpetrators); *In re J.G.*, 701 A.2d at 1265-71 (same); *State v. Houey*, 651 S.E.2d 314, 316-17 (S.C. 2007) (same).

¶ 8. Under the standard adopted in *Berard*, we will abandon the probable-cause and warrant requirements only under exceptional circumstances when the State demonstrates that special needs beyond normal law enforcement make those requirements impracticable and those special needs outweigh countervailing privacy interests. 154 Vt. at 310-11, 576 A.2d at 120-21. It is the State's burden, then, to show both that there are special needs outside law enforcement making warrants impracticable and that those needs outweigh any countervailing privacy rights upon which the warrantless search intrudes. See *id.* "Requiring the State to demonstrate that it has special needs for a warrantless, suspicionless search or seizure 'focuses attention on the nature

and extent of those needs and allows the courts, as the traditional protectors of [Article Eleven] rights, to pursue the necessary balancing test in a manner calculated to interfere least with preservation of those rights.'" *Martin*, 2008 VT 53, ¶ 9 (quoting *Berard*, 154 Vt. at 311, 576 A.2d at 121).

¶ 9. Section 3256 addresses both the testing of the perpetrator and the testing and support of the victim of unlawful sexual conduct. The sections dealing with the testing and support of the victim are uncontroversial and are not the subject of this appeal. Upon the request of the victim "at any time after the commission of a crime involving a sexual act," the state "shall" provide to the victim various services, including "counseling regarding human immunodeficiency virus (HIV)," confidential testing "for HIV and other sexually-transmitted diseases," counseling regarding "the accuracy of the testing, and the risk of transmitting HIV and other sexually-transmitted diseases to the victim as the result of the crime involving a sexual act," and "prophylaxis treatment, crisis counseling, and support services." 13 V.S.A. § 3256(g). The state is also required to provide "sexual assault cross-training between sexual assault programs and HIV and AIDS service organizations." *Id.* § 3256(i).

¶ 10. At issue in this appeal are the first six subsections of the statute that concern the testing of convicted sex offenders. The victim of a sexual act "which creates a risk of transmission of the etiologic agent for AIDS" may obtain an order requiring the perpetrator "convicted" of an offense based on that act to be tested for AIDS and other sexually transmitted diseases. *Id.* § 3256(a)-(b). If the court determines that the offender has been convicted of a crime involving a sexual act with the victim, as defined in the statute, *id.* §§ 3256(b)(1), 3251(1) (defining "sexual act"), "the court shall order the test to be administered," *id.* § 3256(c). "The results of the offender's test shall be disclosed only to the offender and the victim," *id.* § 3256(d), and the test results and record of the court proceedings "shall be sealed," *id.* § 3256(j).

¶ 11. Defendant first argues that the trial court erred in concluding that § 3256(a)-(f) serves special needs beyond law enforcement sufficient to justify the abandonment of our normal probable-cause and warrant requirements. We disagree. As courts in other jurisdictions have uniformly held in examining similar statutes, statutes such as these are directed at public health

matters, not law enforcement, and therefore satisfy the first part of the special-needs standard. See, e.g., *People v. Adams*, 597 N.E.2d 574, 581 (Ill. 1992) ("The HIV testing statute is designed to serve a public health goal, rather than the ordinary needs of law enforcement."); *In re J.G.*, 701 A.2d at 1266 (stating "that the tests are not intended to be used to gain evidence for criminal prosecutions and do not place offenders at risk of a new conviction or longer sentence"); *In re Juveniles A, B, C, D, E*, 847 P.2d 455, 459 (Wash. 1993) (en banc) (stating that testing statute "is designed to protect the victim, the public, and the offender from a serious public health problem" rather than "to gain evidence for a criminal prosecution" or to place sexual offenders "at risk for a new conviction or a longer sentence"). Indeed, § 3256(c) explicitly states that samples taken of the sexual offenders "shall be used solely for purposes of this section," and thus test results from the samples may not be used for criminal prosecution or other law enforcement purposes.

¶ 12. Moreover, the courts have also recognized that imposing probable-cause and warrant requirements would be entirely impracticable in this context because many sexually transmitted diseases, and most particularly the AIDS virus, have no outward manifestations that would permit a probable-cause determination for obtaining a warrant. See *In re J.G.*, 701 A.2d at 1267 (finding warrant and individualized suspicion requirements impractical because sexual offenders have no outward manifestations of infection); *Houey*, 651 S.E.2d at 317 (same); *In re Juveniles*, 847 P.2d at 459-60 (same). Hence, requiring probable cause and a warrant for such searches would effectively preclude the testing of sex offenders and thus negate the statute. See *In re J.G.*, 701 A.2d at 1267 ("Requiring probable cause or individualized suspicion before testing could be conducted would create the proverbial Catch-22 and would frustrate the governmental purpose behind the search." (quotations omitted)).

¶ 13. Defendant contends that our decision in *Martin* is not controlling here because the DNA-collection regime upheld under the special-needs test in that case targeted all felons rather than particular individuals. In defendant's view, § 3256 targets particular individuals and therefore must be subject to the normal probable-cause and warrant requirements. We find this argument unpersuasive. Both statutes permit the testing of a category of persons based on their offender status. On this point, *Martin* is not distinguishable from the instant case.

■ ¶ 14. Having determined that § 3256 addresses special needs beyond normal law enforcement, we must engage in a context-specific inquiry in which we balance "the competing public and private interests at stake." *Martin*, 2008 VT 53, ¶ 21. Specifically, we must balance the governmental interests forwarded by § 3256 against the privacy interests invaded by the statute. We first examine the privacy interests at stake here because they are more straightforward. At the outset, we recognize that the statute's targeted class — convicted sex offenders — has greatly diminished privacy interests, particularly with respect to precluding the testing of bodily fluids forced upon their victims in criminal sexual acts. See *In re Juveniles*, 847 P.2d at 460 ("For sexual offenders in particular, their expectation in privacy in bodily fluids is greatly diminished because they have engaged in a class of criminal behavior which presents the potential of exposing others to the AIDS virus."). Moreover, the taking of a blood sample or a cheek swab is a relatively minimal intrusion on privacy. See *Gov't of Virgin Islands v. Roberts*, 756 F. Supp. 898, 901 (D.V.I. 1991) (noting that courts have long recognized relatively minimal privacy intrusion of routine blood tests); *Adams*, 597 N.E.2d at 582 ("The actual physical intrusion required by the HIV testing statute is relatively slight and poses no threat to the health or safety of the individual tested.").

■ ¶ 15. On the other hand, courts have recognized "that the information obtained as the result of a positive HIV test may have a devastating impact on individuals who would prefer not to know their true status" and that "persons with AIDS are often stigmatized and subject to social disapproval." *Adams*, 597 N.E.2d at 582-83; *Roberts*, 756 F. Supp. at 902 (discussing discrimination and other "devastating consequences" resulting from society's misunderstanding of AIDS). "Mandatory testing and disclosure of HIV status thus threaten privacy interests beyond the taking of the blood sample, particularly because of the social stigma, harassment, and discrimination often suffered by individuals who have AIDS or who are HIV-positive." *In re J.G.*, 701 A.2d at 1267.

■ ¶ 16. The degree to which convicted sex offenders may be subject to this more significant invasion of privacy associated with mandatory HIV testing "is a function of how widely the results are disseminated." *Roberts*, 756 F. Supp. at 902. "The risk of stigmatic harm therefore speaks not to whether the search should

transpire in the first instance, but rather to the extent to which the private medical facts learned from the procedure should be disclosed." *Id.* In short, the only privacy interest of any significance in this context is the risk of public dissemination of positive test results.

¶ 17. We now examine the other side of the equation — the governmental interest in testing sex offenders. On its face, the statute begs several questions. How does the testing of sex offenders following conviction contribute to the state's interest in public health and, more specifically, the well-being of the victims of sex crimes? What is the nexus between testing offenders following conviction and providing relevant information to victims about their risk of contracting sexually transmitted infectious diseases? Given that testing offenders after conviction apparently would not provide any information as to when a sexually transmitted disease was contracted relative to the timing of the sex offense for which they were convicted, how does the testing further the state's public health interest?

■ ¶ 18. None of these questions was addressed at the non-evidentiary hearing before the trial court.[1] No evidence, expert or otherwise, was presented by either party regarding the efficacy

---

[1] Apparently, the dissent would also avoid these questions based on the presumption that legislative acts are constitutional. According to the dissent, the health benefits of the provision are obvious and do not require expert analysis, and our examination of legislative history to better understand the claimed governmental interests in this case "improperly expands our role in conflict with the exercise of the legislative process," goes beyond "the limits of our review," and "wars with the clear intent of the law." *Post,* ¶¶ 27, 29. To the contrary, the dissent's position is inconsistent with our judicial role in reviewing statutes alleged to be in violation of individual constitutional rights. The presumption of validity that we give to legislative acts does not require us to "abdicate our responsibility to examine a disputed statute independently and ultimately determine its meaning." *In re MacIntyre Fuels, Inc.,* 2003 VT 59, ¶ 7, 175 Vt. 613, 833 A.2d 829 (mem.). Nor are we required to presume as a matter of faith the existence of a valid governmental interest or to ignore our responsibility to apply the special-needs test adopted by this Court — particularly in a case such as this, where the proffered governmental interests are not apparent from the record and, in fact, are seriously questioned by experts and courts. See *Badgley v. Walton,* 2010 VT 68, ¶¶ 20, 40, 188 Vt. 367, 10 A.3d 469 (emphasizing that statutes are presumed to be constitutional, but also noting that, while no legislative record existed, "the issues are well framed by the national debate" and "the expert evidence in this case reads like a microcosm of the national debate"); see also *Ferguson v. City of Charleston,* 532 U.S. 67, 81 (2001) (noting that Court does not "simply accept the State's invocation of a

or causal nexus of testing offenders with respect to furthering the state's presumed interest in protecting the health of the victims of sex crimes. The trial court concluded that there was no need for an evidentiary hearing or findings because the victim's right to know "whether or not there is a dormant sexually transmitted disease trumps any claim of privacy" by defendant. According to the court, given our holding in *Martin*, defendant's constitutional claim "doesn't even rise to the level of argument from the Court's perspective."

¶ 19. Because this case presents a different context from *Martin*, and because nothing in the record informs the balancing test we must perform under *Martin*, we examined the legislative history of the bill enacted as § 3256.[2] As it turns out, the part of § 3256 mandating the testing of sex offenders was a controversial proposition that had been introduced in various bills and debated and negotiated in legislative committees over several legislative sessions. In 2001, the year the bill finally became law, witnesses before the House and Senate Judiciary Committees, including a medical doctor specializing in infectious diseases, testified that testing sex offenders following conviction offered no medical benefit for victims because health care issues need to be ad-

'special need,' " but rather engages in close review of scheme and considers "all the available evidence in order to determine the relevant primary purpose").

[2] Our special-needs analysis compels us to balance the competing public and private interests at stake, *Martin*, 2008 VT 53, ¶ 21, which, in turn, necessarily requires us to consider the strength of the alleged governmental interests. In the absence of any record assisting us in that regard, we have a responsibility to examine the legislative history of the challenged statute to better understand those interests. See *In re Dep't of Bldgs. & Gen. Servs.*, 2003 VT 92, ¶ 14, 176 Vt. 41, 838 A.2d 78 (noting that we have frequently relied upon legislative history to discern meaning of statutes). The dissent would forego examining legislative history and instead presume that the challenged provision serves an important government interest in requiring perpetrators to produce information that may help to "reduce[] the health risks to, and mental anguish of, the victim and . . . of unwitting transmission to others." *Post*, ¶ 27. As detailed herein, however, the legislative history reveals that this was not the governmental interest behind the challenged provision and that the provision does not in fact serve such an interest. The dissent asserts that our examination of the legislative history is "not reliable" because it considers the comments of a committee witness, *post*, ¶ 32, but, as noted, even the chairs of the legislative committees dealing with the proposed statute recognized the apparent lack of medical usefulness in testing offenders and candidly acknowledged that the challenged provision was inserted into the statute to preserve federal funding rather than to provide doubtful medical benefits to sexual assault victims.

dressed as soon after the sexual assault as possible and, given the normal lag time between the commission of the crime and conviction, the victims will have or should have already been tested themselves for sexually transmitted diseases.

¶ 20. The medical expert testified that HIV testing identifies antibodies that the body produces to counteract the presence of the virus. The latency period between exposure to the virus and the accumulation of sufficient antibodies to result in a positive test is normally between six weeks and six months. For a victim potentially exposed to the AIDS virus to benefit from prophylaxis treatment aimed at reducing the chances of incurring the virus, the treatment must commence within a seventy-two-hour period. Therefore, testing the offender following conviction cannot inform a decision as to whether to begin the rigorous prophylaxis treatment. Nor would such testing normally precede the six-week-to-six-month latency period during which the victim's own testing might not yet reveal the presence of the virus. Hence, neither a negative nor a positive result from the offender's testing would appear to have any value for the victim. Moreover, any positive test result from the offender would have limited value for the additional reasons that the tests do not indicate when the virus was incurred and that the chances of passing the virus on to a sexual assault victim are very small. Indeed, even those who testified in support of testing offenders acknowledged that such testing provided little or no medically useful information for victims of sexual crimes.

¶ 21. Faced with this testimony, the chairs of both the House and Judiciary Committees acknowledged the apparent lack of medical usefulness in testing offenders, but explained that the State of Vermont would not be eligible to receive roughly $175,000 per year in federal grants to fund testing and counseling for sexual assault victims — as set forth in the second part of § 3256 — unless the statute required testing the perpetrators. This appears to be the principal driving force behind incorporating in § 3256 the sections compelling the testing of sex offenders upon the request of the victim.

¶ 22. If retaining federal funding were the sole governmental interest supporting the challenged portion of the statute, then the constitutionality of the law would be suspect because there would be no nexus between the law's intrusion on even the diminished privacy interest here and the information obtained from that

intrusion. That is not the case, however. There was additional testimony before the legislative committees in support of testing offenders unrelated to preserving federal grant money. The director of Crime Victim Services testified that sexual assault victims do not necessarily consider the issue of testing offenders in a logical way as perceived by nonvictims. While recognizing that testing victims is the only way to determine definitively whether they have contracted an infectious sexual disease, and in particular the AIDS virus, the director explained that victims want the peace of mind that would result from also testing the perpetrator and that they feel further violated if their attacker refuses to submit to the testing of bodily fluids forced upon them during a sexual assault.

¶ 23. Courts have also recognized the psychological benefit for victims of having the perpetrator tested even if such testing, as a practical matter, provides little or no useful medical information to the victim. See *Ward*, 131 F.3d at 342 (noting that testing perpetrator may provide "peace of mind" to victim because of possibility that virus would not manifest itself in victim for years); *Roberts*, 756 F. Supp. at 903 (concluding that there is "considerable medical utility" in testing offender even though results will not be dispositive for victim, and noting that unpredictable latency period means that victims who have tested negative may relieve anxiety if perpetrator is tested); *Superior Court*, 930 P.2d at 493-94 (acknowledging that "some experts regard perpetrator tests as useless," but noting that other experts "conclude that knowledge of the perpetrator's HIV status, though inconclusive, may be helpful to the victim").

¶ 24. We concur. One hardly need document the obvious trauma and suffering endured by victims of sexual assault. See *State v. Bunner*, 453 N.W.2d 97, 101-03 (Neb. 1990) (quoting several law review articles detailing psychological trauma common to rape victims and concluding "it is all too evident that one need not be specially trained in medicine or psychology to recognize and appreciate the injury from a forceful sexual intrusion into another's body and invasion of the mind and very personality of another human being"). Indeed, the nature of a sexual assault furnishes "a basis for a judicial determination that a sexual assault victim sustain[s] serious personal injury in the form of extreme mental anguish or mental trauma." *Id.* at 103 (quotations omitted).

▇ ¶ 25. When that trauma is further exacerbated by a legitimate fear of contracting a life-threatening sexually transmitted disease, the desire of victims to have the perpetrator tested to allay their fears is entirely understandable and real. Therefore, although the consensus among medical experts is that testing offenders — particularly following conviction after months or even years have passed — has little or no direct medical benefit to victims, testing offenders can provide to victims some psychological benefit that outweighs the offenders' significantly diminished interest in preventing the testing of bodily fluids forced upon their unwilling victims. *Johnetta J. v. Municipal Court*, 267 Cal. Rptr. 666, 671-72 (Ct. App. 1990) (citing expert testimony that those exposed to AIDS virus suffer extreme anxiety and thus may benefit psychologically from even inconclusive testing of offender); *In re Juveniles*, 847 P.2d at 461 (accord).

▇ ▇ ¶ 26. Accordingly, as long as the trial court imposes restrictions that comport with the statute's obvious intent to prevent public dissemination of the perpetrator's test results, we find no constitutional infirmity to the statute. Cf. *In re J.G.*, 701 A.2d at 1271 (reading confidentiality requirement in testing statute "to place reasonable restrictions on public dissemination of the offender's HIV status by the victim"). Section 3256(d) provides that "[t]he results of the offender's test shall be disclosed only to the offender and the victim." Plainly, the Legislature was concerned with the privacy rights of offenders and chose to strictly limit revelation of their test results. In this case, at the hearing on the request for testing, the prosecutor suggested that a protective order could be issued to preclude the victim from revealing defendant's test results to anyone other than medical providers, but the court made no such order. To safeguard defendant's privacy interests in not having any potential positive test results disseminated publicly, we remand the matter for the court to order the victim not to disclose defendant's test results to anyone except for the victim's medical provider or counselor, who, in turn, would have an obligation to keep confidential information revealed by their patients.

*The order of the Windsor Superior Court, Criminal Division, dated September 22, 2010, is affirmed in all respects, except that the matter is remanded for the court to impose restrictions, consistent with this opinion, on the victim's disclosure of any results from the testing of defendant for sexually transmitted diseases.*

¶ 27. **Reiber, C.J.,** concurring and dissenting. The testing and counseling statute at issue here, 13 V.S.A. § 3256, is plainly a public health initiative aimed at giving medical and emotional support to victims of sexual assault. Thus, I agree with the majority that the statute does not violate Chapter I, Article 11 of the Vermont Constitution because it serves a special need beyond ordinary law enforcement. An important government interest is at stake when demand for testing is made by a victim under the statute in that testing perpetrators may produce information that reduces the health risks to, and mental anguish of, the victim and thus lessens the chance of unwitting transmission to others. Such purpose outweighs the extremely limited privacy interest an offender has in submitting a sample of bodily fluids. The government purpose served by the legislation and its limitation on disclosure in my view do not compel us to resort to examination of testimony taken before a legislative committee. The issue in this case involves determining the validity of a statute's stated purpose, not deciphering legislative intent to resolve the meaning of particular statutory language. Defendant did not present evidence challenging the link between testing and the medical or psychological benefit to victims of sexual assault. Thus, the majority's analysis of legislative history on this point is unnecessary and improperly expands our role in conflict with the exercise of the legislative process. Furthermore, because the statute already imposes restraint on the distribution of the results of such testing, there is no basis to remand for a protective order with further conditions protecting the perpetrator's privacy. I would affirm the court's order, and therefore respectfully dissent.

¶ 28. The question of whether 13 V.S.A. § 3256 violates an offender's right under Article 11 to be free from a warrantless search or seizure is a question of law that we review de novo. *State v. Martin,* 2008 VT 53, ¶ 8, 184 Vt. 23, 955 A.2d 1144. While Article 11 protects against warrantless searches, a search may nonetheless be constitutional if its purpose is to fulfill a special need beyond ordinary law enforcement. *Id.* ¶ 9. I agree with the majority holding that § 3256 is aimed at public health and therefore meets this requirement. If the special need exists, then "we balance the need served against the privacy intrusion at stake." *Id.*

¶ 29. The majority claims that "nothing in the record informs the balancing test we must perform under *Martin,*" *ante,* ¶ 19,

and proceeds to recite detailed legislative history, including quoting one of the medical experts who testified before a legislative committee. This analysis exceeds the limits of our review. It wars with the clear intent of the law and the limitations of the statute. Our rules of statutory construction are aimed at discerning legislative intent. As we have explained, "legislative intent is to be ascertained from the act itself, which is presumed to be in accordance with the ordinary meaning of the statutory language," and "[w]here statutory language is clear and unambiguous in its meaning, as in the present case, we will look no further in an effort to determine a contrary legislative intent." *Cavanaugh v. Abbott Labs.*, 145 Vt. 516, 530, 496 A.2d 154, 163 (1985) (quotations omitted).

¶ 30. The constitutional issue in this case is not a question of statutory interpretation where the meaning of a word or phrase is not clear, but involves determining whether this statute's authorization of a warrantless search is supported by a legitimate government interest. To make such an assessment, we need not inquire into the Legislature's subjective intent, but instead must determine if legitimate public interests are served. See *Martin*, 2008 VT 53, ¶ 21 (listing interests served without resort to legislative history). When reviewing a statute, we "accord deference to the policy choices made by the Legislature." *Badgley v. Walton*, 2010 VT 68, ¶ 38, 188 Vt. 367, 10 A.3d 469. The State does not have the burden to prove a statute is constitutional; rather, the statute is presumed constitutional. *Id.* ¶ 42. In this case, defendant offered little to challenge the State's asserted public interest. As the majority notes, neither side presented evidence "regarding the efficacy or causal nexus of testing offenders with respect to furthering the state's presumed interest in protecting the health of the victims of sex crimes." *Ante*, ¶ 18. Absent a presentation of concrete evidence from defendant challenging the statute, I believe that the State had no obligation to affirmatively make such a showing. If the court can discern an adequate interest that is served, which it did in this case, then that is sufficient to uphold the statute, even if other interests may be furthered.[3]

---

[3] Consequently, it is wholly irrelevant that the inclusion of a testing provision was also a necessary prerequisite for the state to be eligible for federal grants. *Ante*, ¶ 21.

¶ 31. Here, the statute plainly reveals its purpose is to give support — both medical and psychological — to victims of sexual crimes.[4] As the majority recognizes, the psychological injury to a victim of sexual assault is obvious and needs no special expert analysis. *Ante*, ¶ 24. Even if there is little medical treatment benefit to victims to receiving the results of a medical test after conviction, our Legislature rationally concluded that the mental health aspects are no less important. There is a psychological benefit to victims in obtaining the results of a test that outweighs the perpetrator's small privacy interest in his bodily fluids. Other courts have reached the same conclusion. See *In re J.G.*, 701 A.2d 1260, 1270-71 (N.J. 1997); *State v. Houey*, 651 S.E.2d 314, 320 (S.C. 2007); *In re Juveniles A, B, C, D, E*, 847 P.2d 455, 460-61 (Wash. 1993). On this point, I disagree with the majority's statement that a negative result has no value to a victim. *Ante*, ¶ 20. A perpetrator's negative result after conviction can provide a victim with valuable peace of mind. *In re J.G.*, 701 A.2d at 1270 (discussing psychological benefits of testing, including that negative result would give victim substantial reassurance); *In re Juveniles*, 847 P.2d at 461 (explaining that assailant's negative result is useful in allaying concerns of victim).

¶ 32. Even if some ambiguity in the legislative purpose existed that required resort to legislative history, the analysis engaged in by the majority is not reliable. We have explained that a witness's comments at a committee hearing are accorded "little weight" in determining legislative intent. *State v. Madison*, 163 Vt. 360, 373, 658 A.2d 536, 545 (1995). Similarly, the views of expert witnesses are not determinative indicators of legislative intent since these experts are necessarily there to present their own views — which may be either accepted or rejected by the Legislature. Thus, I disagree with the majority's decision to rely on expert testimony presented to the committee.

¶ 33. Finally, even with the expert testimony, I see no reason to remand this case. The majority concludes that to protect the privacy rights of this sex offender, the court must issue a protective order precluding the victim from disseminating test results to anyone other than a medical provider. *Ante*, ¶ 26. But this limitation is not in the statute, which already includes several protections of a perpetrator's privacy, including that the results of

---

[4] Indeed, even defendant recognizes this fact.

the test "shall be disclosed only to the offender and the victim," 13 V.S.A. § 3256(d), and that "[t]he record of the court proceedings and test results pursuant to this section shall be sealed," *id.* § 3256(j). If the Legislature wanted to extend the scope to a point intended to prohibit the victim from giving the information to a future partner or a friend it could have done so. We should not conclude that the very limited privacy interest of those convicted of sexual assault under this law can permit or compel a court to order limits on the victim's use of the information — information that, for example, could inform effective treatment and inhibit spread of communicable disease.

¶ 34. An offender's privacy protections are greatly diminished by this particular criminal act. Having sexually assaulted the victim and deposited his DNA without consent — an act of physical harm if not also an implicit, if not explicit, waiver of confidentiality — the offender's remaining privacy rights are sufficiently defined by the statute. What the victim, a private citizen, does with the information afterwards was of no concern to the Legislature and, absent legislative direction to the contrary, is no business of this Court. The law does not call on the courts to prohibit further disclosure. Because consideration of additional limits is not constitutionally required, it amounts to a policy choice and "[o]ur function is not to substitute our view of the appropriate balance for that of the Legislature." *Badgley,* 2010 VT 68, ¶ 24. I would affirm, and therefore dissent.

¶ 35. I am authorized to state that Justice Burgess joins this dissent.